**John Doe v Archdiocese of N.Y.**

2025 NY Slip Op 33034(U)

July 30, 2025

Supreme Court, New York County

Docket Number: Index No. 950260/2019

Judge: Sabrina Kraus

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

**PRESENT:**    **HON. SABRINA KRAUS**

*Justice*

-------------------------------------------------------------------------------X

JOHN DOE,

               Plaintiff,

             - v -

ARCHDIOCESE OF NEW YORK, OUR LADY OF MOUNT
CARMEL CHURCH, OUR LADY OF MOUNT CARMEL
SCHOOL

               Defendants.

-------------------------------------------------------------------------------X

| | |
|---|---|
| **PART** | **CVA 1 / 57M** |
| **INDEX NO.** | 950260/2019 |
| **MOTION DATE** | 04/23/2025 |
| **MOTION SEQ. NO.** | 002 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113

were read on this motion to/for                JUDGMENT - SUMMARY        .

## BACKGROUND

Plaintiff commenced this CVA action seeking damages for sexual abuse he was subjected to as a child by Rudy Tremaroli ("Tremaroli") at Our Lady of Mount Carmel School (the "School"). Plaintiff asserts a cause of action for negligence against each of the defendants. Plaintiff attended the School from fourth through eighth grade. Plaintiff knew Tremaroli as someone who was always around the School, both during and after the school day, and was specifically a fixture in the gym.

Tremaroli's abuse of Plaintiff began in sixth grade, when he was approximately 11 or 12 years old in 1986, after Plaintiff began playing on the School basketball team. Tremaroli began by grazing and then grabbing Plaintiff's genitals over his shorts on numerous occasions. The sexual abuse then progressed to grabbing Plaintiff's genitals under his clothing, which also

**950260/2019 DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**
**Motion No. 002**

**Page 1 of 14**

1 of 14

occurred in Tremaroli's office and on multiple occasions. When Tremaroli first grabbed Plaintiff's genitals under his clothing, Tremaroli also showed Plaintiff a pornographic video. Tremaroli's abuse of Plaintiff stopped in approximately the end of seventh grade or the beginning of eighth grade, when Plaintiff was approximately 12 to 13 years old, in 1988.

The sexual abuse occurred on over 40 occasions and took place primarily in Tremaroli's office, but also in the ground floor gym bathroom and behind the stage of the gym auditorium. Plaintiff believed the door to Tremaroli's office was open most of the time.

Plaintiff never reported the abuse at the time to any staff members, friends or family.

The Archdiocese of New York ("ADNY") now moves for summary judgment. For the reasons set forth below, the motion is denied.

## DISCUSSION

Summary judgment is a drastic remedy that should be granted only if no triable issues of fact exist, and the movant is entitled to judgment as a matter of law. *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324 (1986). To establish entitlement to summary judgment, the moving party is required to "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case." *Winegrad v. New York Univ. Med. Ctr.*, 64 N.Y.2d 851 (1985). Only if the moving party satisfies this burden does the burden shift to the nonmoving party "to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action." *Alvarez v. Prospect Hospital* 68 N.Y.2d 320, 324 (1986).

The Court must view the evidence "in a light most favorable to the party opposing the motion, giving [that party] the benefit of every favorable inference." *International Rescue Committee v. Reliance Insurance Co.*, 230 A.D.2d 641 (1st Dep't 1996).

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**
**Motion No.  002**

**Page 2 of 14**

[* 2]

A plaintiff bringing a negligence action must allege "a duty owed to the plaintiff by the defendant, a breach of that duty, and injury proximately resulting therefrom" (*Moore Charitable Found. v PJT Partners, Inc.*, 40 NY3d 150, 157 [2023] [*Moore*], citing *Pasternack v Laboratory Corp. of Am. Holdings*, 27 NY3d 817, 825 [2016]; *Solomon v City of New York*, 66 NY2d 1026, 1027 [1985]; *Akins v Glens Falls City School Dist.*, 53 NY2d 325, 333 [1981]).

It is well settled that a defendants' burden cannot be satisfied merely by pointing to gaps in the plaintiff's proof, and that movants herein are required to affirmatively demonstrate the merit of an alleged defense. *In re New York City Asbestos Litigation (Carriero),* 174 A.D.3d 461 (1st Dept. 2019); *CM v West Babylon Union Free School District* 231 AD3d 809 (2nd Dept., 2024); *Doe v Orange-Ulster Bd. Of Coop. Educ. Servs.* 4 AD3d 387, 388-89 (2nd Dept., 2004).

ADNY seeks summary judgment based on its argument that it owed plaintiff no duty to protect him from sexual abuse in a Parish/Catholic School.  ADNY argues that even if it had notice of the abuse, it was without authority to do anything to stop the abuse.  ADNY further argues that the Parish and Church are not its agents, and it exercises no control over them. Finally, ADNY argues that it lacked notice that Tremaroli had a propensity to abuse boys at any time prior to the abuse of plaintiff in 1986.

The Court finds that the record does not support these arguments and that ADNY has failed to make out a *prima facie* case warranting summary judgment.

### *Facts From Which a Jury Could Infer that the Church and Parish are agents of ADNY*

"It is well settled that a principal-agent relationship exists where one retains a degree of direction and control over another." *Garcia v. Herald Tribune Fresh Air Fund, Inc*., 51 A.D.2d 897 (1st Dep't 1976). The question of whether there is a "sufficient degree of direction and control" for an agency relationship is generally a question for the jury. *Id.* Unless the defendant

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**
**Motion No.  002**

**Page 3 of 14**

3 of 14

can produce an agreement which definitively establishes the scope of the alleged agency, then the issue of control cannot be resolved summarily as a matter of law. *Id.* Where the facts "raise the possibility of a principal-agent relationship but 'no written authority of the agent has been proven, questions of agency and of its nature and scope … are questions of fact to be submitted to the jury.'" *Fogel v. Hertz Int'l, Ltd*., 141 A.D.2d 375, 376 (1st Dep't 1988) (*quoting Garcia*, 51 A.D.2d at 897). Generally, "questions as to the existence and scope of the agency must be submitted to a jury." *Time Warner City Cable v. Adelphi Univ*., 27 A.D.3d 551, 552 (2d Dep't 2013); *accord Fogel*, 141 A.D.2d at 376 (*reversing summary judgment, holding evidence of common board member and interrelationship between the defendants shown in agreement between them raises questions regarding the degree of control*).

ADNY asserts that it is completely separate from its Churches and Parishes, including defendants herein. It points to the fact that the institutions maintain separate bank accounts, have independent certificates of incorporation and that the Parish owns the property on which the School is situated pursuant to a Deed. However, the First Department has already held that such documents do not conclusively resolve allegations of agency and control. *J.D. v. Archdiocese of New York*, 214 A.D.3d 561 (1st Dep't 2023)

ADNY argues that the Pastor of the Church has sole responsibility for hiring and training the staff at the Parish and that even though it maintains a Secretary of Education and Superintendent of Schools for its Parish Schools, such individuals were limited to prescribing a course of religious study to further the mission of the Roman Catholic faith and were without authority to do anything more than make suggestions.

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**
**Motion No.  002**

**Page 4 of 14**

4 of 14

However, these arguments are belied by the record in the motion papers. Plaintiff points to the following facts from which a jury could find that ADNY in fact is in control of its Parishes and Schools, and that the Parishes and Schools are properly considered to be its agents.

Since its inception, Mount Carmel Parish, like any parish, belongs to the ADNY per cannon law. Between 1959 and 1992: the School was run by the Parish. under the umbrella of ADNY; the Pastor took guidance or direction from ADNY regarding the operation of the School; all employees of the School would have been hired and/or supervised by the Pastor.

ADNY's Corporate Representative Bishop Gerald Walsh confirmed the Archdiocese's control over non-moving Defendants Our Lady of Mount Carmel Church (the "Church") and School and its agency relationship with Church and School lay and religious personnel who received reports of Tremaroli's dangerousness prior to Tremaroli's abuse of Plaintiff.

ADNY lays great emphasis that the Pastor was in control, not ADNY but ADNY appointed the pastors to parish churches.

Bishop Walsh's testimony established the following general facts regarding the ADNY's control of pastors, priests, and principals at the Church and School. The Archbishop ultimately was responsible for the decision to reappoint a pastor to a subsequent term at a parish. The Archbishop ultimately had the authority to transfer priests from one parish within the ADNY to another parish within the ADNY.

The Archdiocese Department of Education had to approve a principal candidate for a parish school before they could be named principal.

During the relevant timeframe, the Archbishop appointed a vicar to oversee and supervise priests and parishes. ADNY oversaw payment to priests.

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**
**Motion No.  002**

**Page 5 of 14**

If a parish was having financial issues, ADNY, through the Inter-Parish Finance commission, could provide financial support to the parish. For example, in 1983, ADNY gave $121,000 to Mount Carmel Parish.

Parishioners could make complaints about parish staff directly to the Archdiocese and the Archdiocese Personnel Board would properly use its authority to investigate.

ADNY's 1981-1982 insurance policy lists includes as the Insured all affiliated Parishes, Schools and Institutions. Our Lady of Mount Carmel is an affiliated Parish and School as defined in this insurance policy.

The School's corporate representative testified that in every regard the School followed any and all direction given by ADNY.

ADNY, through the Superintendent of Schools, issued teaching certificates to individuals to be eligible to teach at parish schools.

The Mount Carmel Pastor was representative of the Archbishop as stated by the Superintendent of Schools in 1971. In this capacity, the Mount Carmel Pastor had the ultimate decision-making in the hiring or discharging of a teacher at the School. Additionally in this capacity, the Mount Carmel Pastor was charge with the maintenance of the school building and supervision maintenance staff, and directed to remedy as soon as possible, any hazardous conditions made known to him.

In 1964, the Archdiocese, through the Archbishop, assigned Father Anthony Pucci as a Priest at Mount Carmel Parish, where he remained until 1980 when Monsignor Martorella wrote to the Archbishop requesting Pucci's reassignment per the Archdiocesan Personnel Manual.

In 1972, Archbishop Cardinal Cooke appointed Monsignor Martorella as Pastor of Mount Carmel Parish. In 1973, the Archbishop appointed Monsignor Martorella as a member of the

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**          **Page 6 of 14**
**Motion No.  002**

6 of 14

Archdiocese's Commission for Inter-Parish Financing for a three year team, to coincide with his position as Pastor of Mount Carmel Parish. In 1974, the Archbishop responded to Martorella's request made to ADNY for another priest at the Church. This request was consistent with the ADNY's procedures that if a pastor needed assistance, he reached out to the Archdiocese. In 1978, the Archbishop reappointed Martorella as Pastor of Mount Carmel Parish.

In 1980, ADNY's Director of Priest Personnel received a written complaint from a Mount Carmel Parishioner expressing concern that children were being taken out of class to clean the hallway and bathrooms. Bishop Walsh confirmed that this is a concern appropriately addressed to the Archdiocese and the Archdiocese should have investigated it.

In 1980, the ADNY's Director of Priest Personnel received a written complaint from a Mount Carmel Parishioner expressing concern about Monsignor Martorella inappropriately touching his son. Bishop Walsh testified that this is a concern appropriately addressed to ADNY and ADNY should have investigated it.

In 1984, the Archbishop appointed Monsignor Ruvo as the Pastor of Mount Carmel Parish. Beginning in 1971, the Archbishop appointed Monsignor Ruvo as Assistant Chancellor and Director of the Archdiocesan Service Corporation and Secretary for the Pension Plan Office – three positions paid by ADNY within their Chancery Office – for a three year term. The Archbishop reappointed Monsignor Ruvo to these positions multiple times, and Ruvo remained appointed in these positions at the time the Archbishop appointed him Pastor of Mount Carmel Parish In 1985, while Pastor of Mount Carmel Parish, the Vicar General of the Archdiocese asked Ruvo to continue running seminars for priests on social security. Bishop Walsh confirmed that it was common for priests/pastors to take on multiple roles for ADNY, aside from their assignment to a parish. Similarly, in 1985, the Archbishop appointed Ruvo a member of the

**950260/2019  DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**          **Page 7 of 14**
   **Motion No.  002**

7 of 14

ADNY Retirement Plan Board. In 1988, while still Pastor of Mount Carmel Parish, the Archbishop reappointed Ruvo to the Board. In 1990, the Archdiocese reappointed Monsignor Ruvo as Pastor of Mount Carmel Parish.

In 1971, Sister Aurelia applied to the Superintendent of Schools of ADNY to be a principal. In 1972, Sister Aurelia was named Principal of the School. ADNY's Superintendent of Schools approved the Board's recommendation, and reappointed Sister Aurelia as Principal of the School, where she remained until 1985.

In 1985, James Irwin applied to the Superintendent of Schools of ADNY to be a principal. In 1986, James Irwin was named Principal of the School. ADNY's Superintendent of reappointed Irwin as Principal of the School, his last appointment coming in 1999.

Sister Aurelia and James Irwin had to be approved by the Superintendent of Schools of ADNY before they could be appointed Principal of the School. Every three years, ADNY's Principals Review Board reviewed them as candidates for reappointment as Principal of the School.

> Here, the defendant failed to establish, prima facie, its entitlement to judgment as a matter of law dismissing, insofar as asserted against it, the causes of action alleging negligent hiring, supervision, and retention of Bernard. In particular, the defendant failed to eliminate triable issues of fact as to whether it lacked an employer/employee-like relationship with Bernard and, therefore, could not be held liable for negligent hiring, retention, or supervision of Bernard. In this regard, among other things, the defendant's own witness testified that the defendant's members had been variously appointed as teachers, administrators, and principal of the School and had a role in hiring lay teachers and appointing other members to positions at the School.

*Schlesinger v. Sisters of Ord. of St. Dominic*, 236 A.D.3d 1074, 1076 (2nd Dept., 2025).

The Court reaches the same conclusion in this case.

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**
**Motion No.  002**

**Page 8 of 14**

8 of 14

[* 8]

***Evidence that ADNY Knew or Should have known Tremaroli was
abusing Boys at the School and Parish prior to the Abuse of Plaintiff***

ADNY argues it had no prior notice of Tremaroli's propensity to abuse young boys. It basis this argument largely on its claim that it was completely independent from the School and Paris and that there was no agency relationship among the institutions.

As shown above, there is substantial evidence in the record from which a jury could find that the Church and the School, were controlled by ADNY or agents of ADNY. *John Doe III v. Archdiocese of New York et al.*, Index No. 950208/2019 (Sup. Ct. New York County, June 11, 2025)(*holding on similar facts material issues of fact exist regarding the issues of duty, notice, and control as well as agency*).

Where it is determined that there is an agency relationship, notice to the agent is imputed to and binding upon the principal. *Cromer*, 245 F. Supp. 2d at 560 (quoting Restatement (Second) of Agency § 272 (1958)); *see also Skiff-Murray v. Murray*, 17 A.D. 3d 807, 793 N.Y.S. 2d 243 (3d Dep't 2005) (*principal is responsible for the information learned by the agent, regardless of when or how the information was obtained*).Irrespective of the knowledge imputed from agent to principal, where the agent fails to act on the knowledge he or she possesses, then the principal may be vicariously liable for the foreseeable harm caused: "The rule is well established that a principal is vicariously liable for the torts committed by his agent in the course of the employment." *Brown v. Poritzky*, 30 N.Y.2d 289, 292 (1972).

Plaintiff points to the following evidence from which a jury could determine that ADNY had actual or constructive notice that Tremaroli was abusing children prop to Plaintiff's abuse.

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**                                **Page 9 of 14**
**Motion No.  002**

9 of 14

[* 9]

ADNY's policy provides that if allegations of sexual abuse were made by a child to a priest in confession, the priest should encourage the child to seek help and report the abuse to authorities, and to tell them outside of confession so they could report the abuse. Bishop Walsh testified that, despite the Archdiocese lacking any written policies during the relevant timeframe on what a pastor or principal should do if they receive a report raising a concern that a janitor was molesting children, common sense dictates that they should investigate.

Between approximately 1970 and 1973, Doe P.C. told a Mount Carmel Church Priest during confession that Tremaroli touched his "balls and penis" and forced him on Tremaroli's lap.

In approximately 1972, John Doe VI reported to the secretary at the Parish Youth Center, Emilia Longo, that Tremaroli touched him "down there." She responded that if he kept saying that he would not be able to come back to Ciatti Hall.

In approximately 1973, John Doe XXV personally observed School Teacher Dominick Rella make eye contact with and stare at Tremaroli while he was touching and fondling young boys' buttocks at the School gymnasium and in the locker room. Rella, upon observing Tremaroli touching these boys, called Tremaroli over with his finger, and John Doe XXV then saw Tremaroli leave the gym. In approximately 1975, John Doe XXV also witnessed School Principal Sister Aurelia observing Tremaroli touching and fondling young boys' buttocks, including his own, in the hallways at the School.

In approximately 1975, the uncle of John Doe XIII testified that he was with the mother of John Doe XIII when she reported to Monsignor Martorella that she had observed behavioral changes in her son since he started spending time with Tremaroli, and she had caught him inserting a douche inside of his anus in the shower. She reported her concern that this behavior

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**
**Motion No.  002**

**Page 10 of 14**

10 of 14

was being caused by Tremaroli. Martorella responded that another mother had accused Tremaroli of touching her son and that these children were lying and should not be believed.

In approximately 1977, Doe W.M. reported to School Teacher Brother Gilbert during class that Tremaroli fondled him. Brother Gilbert responded by grabbing Doe W.M. by the neck, telling him not to make up stories, and throwing him against the wall. Brother Gilbert went to Doe W.M.'s home that night and told Doe W.M.'s parents that Doe W.M. was making up accusations about Tremaroli. The day after Brother Gilbert went to Doe W.M.'s home, Doe W.M.'s mother took Doe W.M. to Principal Sister Aurelia's office and reported her son's allegations of sexual abuse to Sister Aurelia.

In approximately 1977, the mother of Doe S.F. brought her son to meet with Principal Sister Aurelia. The mother of Doe S.F. reported to Sister Aurelia the sexual abuse perpetrated by Tremaroli on her son, exclaiming that "some fucking white man put a penis on my son's asshole." Doe S.F. told his mother about the sexual abuse perpetrated by Tremaroli approximately seven times from 1977 to 1982. Each time Doe S.F. told his mother about the sexual abuse perpetrated by Tremaroli, his mother reported the sexual abuse to Sister Aurelia. Sister Aurelia always responded that the allegation was "rubbish," and he was a "liar" and dismissed them. Doe S.F. was present each time his mother reported the sexual abuse to Sister Aurelia.

In approximately 1977, the father of John Doe 40 reported to School Teacher Brother Christopher and Principal Sister Aurelia that the gym teacher was touching his son. They responded that they were sorry and would look into it.

Between 1981 and 1986, John Doe 60 reported the sexual abuse perpetrated against him by Tremaroli to multiple Parish employees. When John Doe 60 was in approximately fifth

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**
**Motion No.  002**

**Page 11 of 14**

11 of 14

grade, he reported to Principal Sister Aurelia that Tremaroli, the janitor, touched him "down there in a bad way". The same year, he reported to Teacher Brother Gilbert that Tremaroli that janitor "had touched [him] inappropriately and had done some bad things to [him]". When John Doe 60 was in approximately seventh grade, at the end of altar server training, he reported to Monsignor Ruvo that Tremaroli was touching him "inappropriately" and fondling him. John Doe 60 also reported the sexual abuse to another Priest during altar server training. When John Doe 60 was in approximately seventh grade, he reported to School Teacher Brother John that Tremaroli touched him "in bad places and bad things are happening." Brother John told John Doe 60 to "shut [his] mouth and take [his] seat." When John Doe 60 was in eighth grade, he reported to School Teacher, Phillip Farenga, that he was sexually abused by Tremaroli.

From approximately 1982-1984, Doe C.V. reported the sexual abuse perpetrated against him by Tremaroli to five Parish employees. In approximately 1982, Doe C.V. first reported to an unknown female teacher that Tremaroli was touching his privates and that he was made to touch Tremaroli's privates. This female teacher told Doe C.V. not to mention the abuse to anybody. In approximately 1983, Doe C.V. reported to Brother Gilbert that Tremaroli was touching his private parts and making Doe C.V. touch Tremaroli's private parts. Doe C.V. was again told not to tell anyone about the abuse. Doe C.V. also told Brother Gilbert that Tremaroli anally penetrated him with his penis. Brother Gilbert responded by instructing Doe C.V. not to tell anyone else. In approximately 1983, Doe C.V. then reported to Brother John that Rudy from the gym was touching him. In approximately 1983 to 1984, Doe C.V. next reported to Principal Sister Aurelia that Rudy from the gym was touching his private parts. Sister Aurelia told Doe C.V. that nobody was touching him and to leave her office. Following the first four reports, Doe C.V. reported to Monsignor Ruvo during confession that Rudy from the gym was touching his

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**               **Page 12 of 14**
   **Motion No.  002**

12 of 14

[* 12]

private parts. Doe C.V. also told Monsignor Ruvo that he told a female teacher, Brother Gilbert, Brother John, and Sister Aurelia. Monsignor Ruvo responded by asking Doe C.V. what happened when he made those prior reports, to which Doe C.V. responded, nothing, and then he was instructed to say Hail Mary's and Our Father's.

In approximately 1983, Doe G.G. reported the abuse he endured by Tremaroli to Sister Aurelia on two separate occasions. When Doe G.G. first reported to Sister Aurelia, in her office, that Tremaroli was touching him inappropriately, Sister Aurelia told Doe G.G. he was a liar and not to say such things. When Doe G.G. again reported to Sister Aurelia, this time in the hallway of OLMC School, he reported that Tremaroli was making Doe G.G. "taste him" and Tremaroli was making him put his mouth on Tremaroli's genitals. Sister Aurelia again called him a liar.

In approximately 1985 or 1986, Doe V.T. reported the sexual abuse he endured by Tremaroli to Principal James Irwin and Monsignor Ruvo. Specifically, Doe V.T. first reported to Principal Irwin that he was going to tell the police what Tremaroli did to him, and Irwin told Doe V.T. he was being expelled and to get out of his office. Doe V.T. then reported to Monsignor Ruvo, not in confession, that Tremaroli touched his private places and that he was going to go to the police. Monsignor Ruvo told Doe V.T. not to go to the police and not to say anything about the abuse.

In approximately 1986 or 1987, Doe J.R.C. reported the reported the sexual abuse he endured by Tremaroli to Principal James Irwin. Specifically, Doe J.R.C. reported that "Rudy from the gym" was touching him. Irwin responded, "oh you kids don't know what touching is, it's all love, go back to class."

Tremaroli remained employed at the School and Church until his death in 1992.

## CONCLUSION

**950260/2019   DOE, VII, JOHN vs. ARCHDIOCESE OF NEW YORK**          **Page 13 of 14**
**Motion No.  002**

[* 13]

13 of 14

The Court has considered movant's remaining arguments, including that the Court's review of its conduct is proscribed by the First Amendment and finds the remaining arguments unavailing.

WHEREFORE it is hereby:

ORDERED that the motion is denied in its entirety; and it is further

ORDERED that, within 20 days from entry of this order, plaintiff shall serve a copy of this order with notice of entry on the Clerk of the General Clerk's Office (60 Centre Street, Room 119); and it is further

ORDERED that such service upon the Clerk shall be made in accordance with the procedures set forth in the *Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases* (accessible at the "E-Filing" page on the court's website at the address www.nycourts.gov/supctmanh);]; and it is further

ORDERED that the action is reassigned to Justice Hasa Kingo for trial; and

ORDERED that the parties are directed to reach out to Justice Kingo's Part Clerk and request a date for a pre-trial conference.

This constitutes the decision and order of this Court.

20250730114716SBKRAUSBB729D2AE2B54D19AA06B79A646F8957

| 7/30/2025 | | | | | |
|-----------|--|--|--|--|--|
| DATE | | | | SABRINA KRAUS, J.S.C. | |
| CHECK ONE: | | CASE DISPOSED | X | NON-FINAL DISPOSITION | |
| | | GRANTED | X DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | X | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

[* 14]